IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
July 16, 2013 Session

**AUSTIN WELLS, a disabled person, by and through his conservator and natural mother Carron C. Wells Baker v. STATE OF TENNESSEE and DONALD ESTES and UNIVERSITY OF MEMPHIS FOUNDATION**

**Direct Appeal from the Circuit Court for Shelby County**
**Nos. CT-003593-06, CT-002510-07, and CT-004418-07    Jerry Stokes, Judge**

---

**No. W2012-00189-COA-R3-CV - Filed October 8, 2013**

---

A University of Memphis student fell down an elevator shaft while removing artwork following a required University function at property owned by Donald Estes. The student sued Donald Estes and Estes, LLC, the University, and The University of Memphis Foundation. Summary judgment was granted in favor of the Foundation. The jury returned a verdict of $4,103,720.00, and the fault was ultimately allocated as follows: the State 40%; the student 15%; Estes 45%. Based upon an indemnification agreement, the trial court found the State liable for Mr. Estes' share of the jury verdict, or $1,436,215.20. We find that the trial court erred in concluding that the indemnification agreement indemnified Mr. Estes for his own negligence and in granting summary judgment in favor of the Foundation. However, we affirm the trial court's admission of testimony regarding $410,000 in medical bills, its exclusion of evidence regarding the student's alleged drug use, and its capping of the State's liability at $300,000. The case is remanded for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

John Packard Wade, Memphis, Tennessee, for the appellant, Donald Estes

Robert E. Cooper, Jr., Attorney General and Reporter, William E. Young, Solicitor General, Joseph F. Whalen, Associate Solicitor General, Nashville, Tennessee, for the appellant, State of Tennessee

Gary K. Smith, Karen M. Campbell, John McManus, Memphis, Tennessee, for the appellee, Austin Wells

Richard Glassman, Lacey Adair Bishop, Memphis, Tennessee, for the appellee, The University of Memphis Foundation

**OPINION**

## I. FACTS & PROCEDURAL HISTORY

This case stems from a horrific accident involving University of Memphis graphic design student Austin Wells. On the night of December 14, 2005, an exhibit was held at the Second Floor Contemporary Gallery located at 431 South Main Street in downtown Memphis to display the artwork of graduating seniors. Participation in, and attendance at, the exhibit was a graduation requirement.

The University art department leased the historic facility from building owner Donald Estes. The building was comprised of three floors, plus a basement; the first floor housed a furniture business, the second floor housed the art gallery and architects' offices, and the third floor was used as Mr. Estes' residence. An elevator located on the building's north side serviced all floors, but guests to the Second Floor Contemporary Gallery were expected to access the second floor via an outside staircase located at the building's loading dock. The University, however, requested the use of the elevator to haul heavier and larger exhibits, both before and after the event. Mr. Estes granted the University's request, but he insisted that only he operate the elevator.

Prior to the event, Mr. Estes sent an invoice for the gallery rental as well as an indemnification agreement to Hugh Busby, the University art department employee who organized the exhibit. James "Jed" Jackson, chair of the University art department, signed the indemnification agreement, which Mr. Busby then returned to Mr. Estes.

According to Mr. Estes, he informed Hugh Busby that he would be unavailable to operate the elevator on the night of December 14. Therefore, students requiring the use of the elevator for exhibit removal were instructed to return on the morning of December 15. According to Mr. Estes, Mr. Busby indicated that he would supervise exhibit removal on December 15, but Mr. Busby never appeared at the facility for this purpose.

On the morning of December 15, Austin Wells, along with his father and a friend, arrived at the facility to retrieve his exhibit. They began moving the pieces of his exhibit toward the elevator, which was not currently located at the second floor, and Austin left to

locate Mr. Estes. Moments later, Mr. Estes rode the elevator down from the third floor to the second floor, and Mr. Estes, Austin Wells' father, and Austin Wells' friend loaded his exhibit onto the elevator and Mr. Estes maneuvered the elevator to the first floor. After moving the exhibit onto the loading dock, Austin Wells' father began looking for him. His father heard a noise coming from the elevator shaft, and he found his son in the basement in a semiconscious state at the bottom of the elevator shaft. Austin Wells had suffered multiple serious injuries, including traumatic brain injury.[1]

On July 11, 2006, Austin Wells through his Conservator and mother, Carron C. Wells Baker ("Austin Wells"), filed a Complaint in the Shelby County Circuit Court against Donald Estes and Estes, LLC, (collectively, "Estes") alleging negligence and negligence *per se* and seeking both compensatory and punitive damages. On November 17, 2006, Austin Wells filed a Complaint in the Tennessee Claims Commission against the State of Tennessee alleging negligence and breach of contract by the University of Memphis with regard to the indemnification agreement and seeking compensatory damages. On March 12, 2007, Estes also filed a Complaint in the Claims Commission against the State of Tennessee alleging breach of contract and/or specific performance related to the indemnification agreement. The Claims Commission Complaints were transferred to the Shelby County Circuit Court on May 10, 2007, and all three cases were consolidated by orders entered August 17, 2007, and June 1, 2009.

Following unsuccessful motions for summary judgment by all parties, Austin Wells filed an amended complaint on December 9, 2009, adding The University of Memphis Foundation (the "Foundation") as a defendant. However, on July 6, 2011, the trial court granted summary judgment in favor of the Foundation finding that the Foundation owed no duty of care to Austin Wells.

The trial court bifurcated the issues of tort liability and indemnification, with liability to be considered first. On October 25, 2011, a jury trial commenced regarding liability, with the trial court sitting as the Claims Commission. The jury returned a verdict of $4,103,472.00, and it allocated the fault as follows: Mr. Estes 35%; the State of Tennessee 60%, and Austin Wells 5%. The trial court upheld the damage amount, but it reapportioned Mr. Estes fault at 45%,[2] the State's fault at 40%, and Austin Wells' fault at 15%. Judgments were entered on the jury verdict and on the State's liability.

_____

[1]Austin Wells apparently fell either from the first floor or from the mezzanine level–a half level above the first floor

[2]The trial court required the State to indemnify Estes only for his 35% fault allocated by the jury.

-3-

A trial was then held regarding indemnification. The trial court upheld the indemnification agreement, and therefore, it found the State of Tennessee liable for Mr. Estes' 35% share of the jury verdict, or $1,436,215.20. Judgment was entered against the State in favor of Estes and in favor of Austin Wells as a third party beneficiary. Estes filed a Motion for New Trial, which the trial court denied. The State, Austin Wells, and Estes all filed timely notices of appeal to this Court.

## II. ISSUES PRESENTED

The parties present the following issues for review, as summarized:

The State of Tennessee:

1. Whether the Indemnification Agreement indemnified Mr. Estes for his own negligence; and
2. If the Indemnification Agreement indemnified Mr. Estes for his own negligence, whether the agreement is void as an ultra vires act.[3]

Donald Estes:

1. Whether the trial court erred in allowing testimony regarding $410,000 in medical bills;
2. Whether the trial court erred in excluding evidence regarding Austin Wells' alleged drug use; and
3. Whether the trial court erred in granting summary judgment to The University of Memphis Foundation.

Austin Wells:

1. Whether the trial court erred in capping the University of Memphis' liability at $300,000.

For the following reasons, we find that the trial court erred in concluding that the indemnification agreement indemnified Mr. Estes for his own negligence and in granting

---

[3] In its brief, the State lists an additional issue: Whether the trial court erred in finding the State liable on the negligence claim brought under Tennessee Code Annotated section 9-8-308(a)(1)(C). However, during oral argument before this Court, the State repeatedly stated that it was not challenging the imposition of liability against it, and that it was simply seeking to hold Mr. Estes liable for his share of the verdict. Thus, we find this issue waived, and we will not consider it on appeal.

summary judgment in favor of the Foundation. However, we affirm the trial court's admission of testimony regarding $410,000 in medical bills, its exclusion of evidence regarding Austin Wells' alleged drug use, and its capping of the State's liability at $300,000. The case is remanded for further proceedings consistent with this opinion.

## III. DISCUSSION

### A. Evidentiary Issues

We begin by considering the evidentiary issues raised by Mr. Estes on appeal, as these considerations potentially affect the damages awarded in this case. We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard, giving a wide degree of latitude to the trial court. *Biscan v. Brown*, 160 S.W.3d 462, 468 (Tenn. 2005) (citing *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 131 (Tenn. 2004)); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992) (citations omitted). Under this standard, we will uphold the trial court's determination, irrespective of our inclination to decide the issue differently, so long as the trial court's decision is within the range of acceptable alternatives. *Tait v. Tait*, 207 S.W.3d 270, 275 (Tenn. Ct. App. 2006) (citing *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999)). Even when the trial court abuses its discretion in making an evidentiary ruling, the ruling will not be set aside unless the error "more probably than not affected the judgment or would result in prejudice to the judicial process." **Tenn. R. App. P. 36(b)**.

1. Medical Bills Summary

First, Estes argues that the trial court erred in admitting certain portions of the video deposition testimony of Dr. Shelly Timmons related to $410,000 in medical bills, which Estes sought to exclude via a pre-trial Motion in Limine. Specifically, Estes sought to exclude the following testimony:

Q    We have agreed that we're going to do a medical bill summary,[4] and so I'm going to ask you about some categories of bills that relate to the treatment that was rendered to Austin Wells by you, others at Semmes-Murphey, the Regional Medical Center, and the Baptist Rehab, and I will represent to you that the Semmes-Murphey bills total $30,838 to date.

A    Okay.

_____

[4]It is unclear who had "agreed" to the use of the medical summary. In any event, no argument is made on appeal that any objection to the testimony has been waived.

Q     That the Regional Medical Center bills are $314,344.74. And the Baptist Rehabilitation hospital amount is $65,221.97. And my questions to you about those are these: Number one, do you believe that all the services rendered by those various individuals and institutions were reasonable and necessary?

A     Yes, I do.

Q     Were they necessary to treat the traumatic brain injury he suffered that we are talking about here in this case?

A     Correct.

Q     Were the charges, according to your understanding, fair and reasonable for the types of services rendered at that time and for - - and the services that he received?

A     As far as I'm aware, yes.

Q     Do you believe that they are fair and reasonable?

A     Yes.

[Austin Wells' counsel]: And we will mark as Exhibit 71, late-filed, a summary that reflects those three gross amounts.
(WHEREUPON, SAID DOCUMENT WAS MARKED AS DEPOSITION EXHIBIT NO. 71).

Deposition Exhibit 71 provided:

**Medical Bill Summary for providers below**

**The Regional Medical Center**
    Dates of Service 12/15/2005 to 2/23/2006     $314,344.74

**Baptist Rehabilitation**
    Dates of Service 1/4/2006 to 4/11/2006     $ 65,221.97

**Semmes Murphey**
    Dates of Service 12/15/05 to 6/09     $ 30,838.00
Total     **$410,404.71**

On appeal, Estes essentially argues that Dr. Timmons was not competent to testify as to the reasonableness and necessity of charges included in the Exhibit 71 summary because she did not review the underlying bills such that she could satisfactorily connect the summary with the particular treatments received.

In Tennessee, "[a] physician who is familiar with the extent and nature of the medical treatment a party has received may give an opinion concerning the necessity of another physician's services and the reasonableness of the charges." *Long v. Mattingly*, 797 S.W.2d 889, 893 (Tenn. Ct. App. 1990) (citing *Employers Ins. of Wausau v. Carter*, 522 S.W.2d 174, 176 (Tenn. 1975)). "To be qualified to render these opinions, the physician must first demonstrate (1) knowledge of the party's condition, (2) knowledge of the treatment the party received, (3) knowledge of the customary treatment options for the condition in the medical community where the treatment was rendered, and (4) knowledge of the customary charges for the treatment." *Id.* (citation omitted).

In *Long*, the middle section of this Court specifically considered whether medical experts could base their opinions as to necessity and reasonableness of treatment, at least in part, upon consideration of a medical summary. *Id.* In determining that the above-cited criteria had been established, the Court noted that the experts practiced in the same city as the doctor who had treated the plaintiff and that the experts, themselves, had treated the plaintiff. The court rejected the defendant's argument that the experts were required to base their opinions on a review of the plaintiff's actual medical bills–as opposed to a summary thereof[5]–finding no proof that the summary was inaccurate or deceptive or that any party lacked access to the bills, themselves.

While the medical bills summary in the instant case is less detailed than that in *Long*, we nonetheless, find that the trial court did not abuse its discretion in allowing Dr. Timmons to testify as to the necessity and reasonableness of the medical services rendered to Austin Wells based, in part, on her review of the summary. Both Dr. Timmons' curriculum vitae and her deposition testimony highlight her familiarity with neurosurgery services as well as those particular services provided to Austin Wells.

Dr. Timmons has been a neurosurgeon at Semmes-Murphey Neurologic and Spine Institute in Memphis since 1997. She is both an Associate Professor and the Director of the Neurotrauma Division at the University of Tennessee, Memphis Department of Neurosurgery. Additionally, she is the Chief of Neurosurgery Service at the Regional Medical Center at Memphis, and the Traumatic Brain Injury Program Director at Baptist Germantown Rehabilitation Center–hospitals at which Austin Wells received treatment.

---

[5]In *Long*, the Court noted that the underlying bills had been introduced into evidence at trial and that "a cursory comparison of the tabulation and the bills reveals that the bills themselves contain no relevant information that did not also appear on the tabulation." *Id.* The medical summary in *Long* showed: "(1) the name of each provider, (2) the date the service or product was provided, (3) a description of the service or product, and (4) the charge for the service or product." *Id.*

In her deposition, Dr. Timmons demonstrated familiarity with the date of Austin Wells' injuries, the dates of his hospitalization at the Regional Medical Center, and his subsequent discharge to Baptist Germantown Rehabilitation Center. Dr. Timmons saw Austin Wells on two dates in December 2005 while he was hospitalized at the Regional Medical Center, and she then provided follow-up care to him at Semmes-Murphey. Between December 2005 and October 15, 2008, Dr. Timmons saw Austin Wells "about five, six" times. Dr. Timmons described a surgical procedure in which a portion of Austin Wells' skull was removed to allow brain swelling, and she stated that she performed the follow-up surgery to replace portions of his skull. She further testified regarding the inpatient and outpatient rehabilitation services provided to Austin Wells. She explained that she referred Austin Wells to a neuropsychologist at Semmes-Murphey, and she described the tests performed on Austin Wells and the three reports she received on him relative to neuropsychology. She also described having access to Austin Wells' medical records from both Baptist Germantown Rehabilitation Center and the Regional Medical Center. Regarding her review of the medical bills incurred by Austin Wells, in addition to the testimony cited above, Dr. Timmons testified as follows:

> Q    Have you had an opportunity to look at the bills - -
> A    Yes.
> Q    - - from all the providers?
> A    Yes. Well, the totals anyway that he mentioned and some of the details of the - - yeah.
> . . . .
> A    Not - - not in any great detail.

Despite Dr. Timmons' acknowledgment that she did not review the underlying medical bills "in any great detail[,]" we, nonetheless, find that the trial court did not abuse its discretion in determining that she was qualified to render an opinion regarding the necessity and reasonableness of the totals included in the medical bills summary. Again, Dr. Timmons' deposition testimony demonstrated her extensive familiarity with Austin Wells' condition and the services rendered to him, including her own active involvement in his care. Based upon her lengthy practice in Memphis and her establishment within the neurotrauma community, Dr. Timmons was certainly knowledgeable as to the treatment options available to Austin Wells and to the customary charges associated therewith. As in *Long*, in the instant case there is no proof–or even allegation–that the medical bills summary was inaccurate or deceptive, and although the underlying medical bills were not submitted into evidence, Estes' counsel acknowledged that he had been given access to them. In sum, Dr. Timmons sufficiently demonstrated her qualification to render an opinion regarding the reasonableness and necessity of Austin Wells' medical expenses, and therefore, the trial court did not abuse its discretion in admitting such opinion.

## 2. Alcohol and Drug Use

As a second evidentiary issue, Estes challenges the trial court's exclusion of evidence related to Austin Wells' alcohol and drug use both before and after the injury. From the parties' briefs we are unable to discern the extent of the evidence elicited in the case related to alcohol and drug use.[6] However, the evidence elicited includes Austin Wells' admission to smoking marijuana "from time to time" before and after the accident and his questioning of Dr. Timmons following the accident as to whether smoking marijuana would impair his progress.

After considering Austin Wells' Motion in Limine, the trial court ruled:

As to the Plaintiff's Motion in Limine to Exclude Evidence and Argument of Alcohol and Drugs by the Plaintiff, the Court holds that evidence and arguments of alcohol and drug use prior to the injury on or before December 15, 2005 will be excluded.

Inquiry into the plaintiff's marijuana use after the injury will be allowed but the Court will consider [] further argument on this point.

At trial, evidence related to pre-injury drug and alcohol use was not permitted, but some evidence related to his post-injury drug use was admitted through the video deposition of Dr. Timmons, which was played to the jury. The deposition provided, in relevant part:

Q    Let me ask you about that, the - - the last note in the "History of Present Illness" section - -
A    Uh-huh.
Q    - - where Mr. Wells states that he had used marijuana in the past and had wondered if that would be okay.
A    Uh-huh.
Q    Can you tell us a little something about that conversation - -
A    Um - -
Q    - - as you recall?
A    - - as far as I remember, he just wanted to know if that would impair his progress, entire progress, and I told him that it would and that I advised against it, and he voiced willingness to comply with that

---

[6]Austin Wells' memorandum in support of his Motion in Limine characterizes the evidence as "a hodgepodge of tangential testimony and stray evidence relating and/or suggesting past and present marijuana use by Austin Wells[.]"

recommendation. He hadn't been drinking any alcohol either, but he just wanted to know about that.

Q    Was there any indication as to what period of time he was talking about?

A    No.

Q    So there was no indication as to whether this was used even after the injury?

A    No, but I got the feeling that he had not since the injury because he was asking me about it, so . . .

Q    But - - but he didn't say one way or the other?

A    Not that I remember.

Dr. Timmons then testified, as follows, regarding a January 31, 2006 Baptist Rehabilitation medical history form for Austin Wells:

A    . . . . Yes, it says: If you use drugs or alcohol, which substance. And it says: N/A - - or not applicable - - since 12/15/05. Frequency and amount of use: Typical college kid.

On appeal, Estes contends that the trial court erred in disallowing evidence of pre- and post-injury drug and/or alcohol use by Austin Wells, because, he claims, Austin Wells' personal habits as to sobriety and industry are relevant to the economic value of his alleged inability to work, as calculated at trial by economist Dr. Gilbert Mathis.

Additionally, Estes argues that "there is evidence which indicates that Mr. Wells was using drugs or alcohol on the date of his injury." As support for this assertion, Mr. Estes cites Austin Wells' medical history form, which, regarding drug and alcohol use stated, "N/A since 12/15/05[,]" and he asserts that this form "indicat[es] that there was usage up to and including the date of the fall." Estes claims that the trial court's exclusion of date-of-injury drug use prejudiced him because such evidence, if admitted, could have potentially increased the fault attributed to Austin Wells. He also cites Dr. Timmons' testimony, which according to Estes, "reflected that there was a history of alcohol and/or recreational drug use."

First, we reject Estes' contention the medical history form indicated drug use by Austin Wells on December 15, 2005. The form more correctly indicated that his injury on December 15, 2005 had rendered him unable to use drugs or alcohol–not that he had used such on the morning of the accident. In any event, the portions of Dr. Timmons' videotaped deposition in which she read from this form, and in which she acknowledged Austin Wells' prior drug use, were played to the jury. Accordingly, we find no abuse of discretion in the trial court's exclusion of evidence related to date-of-injury and post-injury alcohol and/or

-10-

drug use.

Again, regarding pre-injury drug use, Mr. Estes claims "it is a component required to be considered by the jury in order to properly consider [economist Dr. Mathis'] testimony as to the financial value of Plaintiff's claim based upon his inability to maintain employment." Estes, however, provides no citation to authority to support his argument that sobriety and industry is a necessary–or even appropriate–factor for the jury to consider in calculating damages stemming from a plaintiff's inability to work.[7]  Accordingly, we likewise find no abuse of discretion in the trial court's exclusion of evidence related to pre-injury alcohol and/or drug use.

### *B. Indemnification*

Next, we will consider the State's argument that the trial court erred in finding that the indemnification agreement between the University and Estes indemnified Mr. Estes for his own negligence. "In 'resolving disputes concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language.'" *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 889-90 (Tenn. 2002) (quoting *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)).  "If clear and unambiguous, the literal meaning of the language controls the outcome of contract disputes." *Id.* at 890.  The indemnification agreement between the University and Mr. Estes provides:

### INDEMNIFICATION AGREEMENT

For good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the undersigned, University of Memphis Art Dept., agrees to indemnify, defend, and hold free and harmless, Don Estes, individually, and Estes, L.L.C., of 431 South Main St., Memphis, Shelby County, Tennessee 38103 and each of his or their agents, servants, employees, assigns, from and against any and all actions, claims, liabilities, assertions of liability, losses, costs, damages and expenses, including but not limited to, attorney's fees, investigative and discovery costs and court costs, which in any manner may arise or be alleged to have arisen or resulted or alleged to have resulted from the presence, activities and promotions of any nature or

---

[7]However, in *wrongful death cases*, the decedent's habits as to sobriety and industry are considered in calculating the pecuniary value of the decedent's life.  *See Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 600 (Tenn. 1999) (citing Tenn. Code Ann. § 20-5-113).

otherwise of the undersigned, his/it's [sic] agents, invitees, or employees on the premises known as 431 South Main St., Second Floor Contemporary Gallery, *buildingstudio*, Memphis, Shelby County, Tennessee 38103 including but not limited to claims for bodily injury or death of persons and for loss of damage to property.

The undersigned acknowledges that the premises are not handicapped accessible.

The undersigned has inspected the premises and has found the premises to be suitable for his/it's [sic] event, currently planned for (date) Dec. 14, 2005.

The indemnification agreement was executed by University art department chair Jed Jackson on December 8, 2005.

"The majority rule among American jurisdictions is that idemnifying a party for its own negligence is extraordinary risk shifting and such agreements must be regarded as exceptional rather than usual in the majority of business transactions." *Phoenix Ins. Co. v. Estate of Gainer*, No. M2007-01446-COA-R3-CV, 2008 WL 5330493, at *7 (Tenn. Ct. App. Dec. 19, 2008) (citations omitted). "The U.S. Supreme Court noted its support for this widely accepted princip[le] stating that 'a contractual provision should not be construed to permit an indemnitee to recover for his own negligence unless the court is firmly convinced that such an interpretation reflects the intention of the parties.'" *Id.* (quoting *U.S. v. M.O. Seckinger, Jr.*, 397 U.S. 203, 211, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970)).

Tennessee has long adhered to the majority rule. *Id.* "Under Tennessee law, contracts that indemnify a party against one's own negligence, while not against public policy, must state that intent in 'expressly clear and in unequivocal terms.'" *Id.* (citing *Kellogg Co. v. Sanitors, Inc.*, 496 S.W.2d 472, 474 (Tenn. 1973); *Kroger Co. v. Giem*, 387 S.W.2d 620, 626 (Tenn. 1965)). "'Mere general, broad, and seemingly all inclusive language' is not sufficient to impose liability for the negligence of the indemnitee.'" *HMC Techs. Corp. v. Siebe, Inc.-Robertshaw Tenn. Div.*, No. E2000-01093-COA-R3-CV, 2000 WL 1738860, at *2 (Tenn. Ct. App. Nov. 27, 2000) (quoting *Wajtasiak v. Morgan County*. 633 S.W.2d 488, 490 (Tenn. Ct. App. 1982)).[8] As the eastern section of this Court stated in *Wajtasiak v. Morgan County*, 633 S.W.2d 488, 490 (Tenn. Ct. App. 1982), "As other courts have often noted, if negligent acts of the indemnitee are intended to be included in the coverage, it would only take a few seconds for the attorneys to use appropriate express language such as 'including indemnitees'

_____

[8]Despite Mr. Estes' assertions to the contrary, this principle was not abolished by the adoption of comparative fault.

-12-

acts of negligence.'" As such, "'[a] contract of indemnity purporting or claimed to relieve one from the consequences of his failure to exercise ordinary care must be strictly construed.'" *Kellogg Co.*, 496 S.W.2d at 474 (quoting 41 Am.Jur.2d Indemnity § 13).

Following the indemnity portion of the bifurcated trial, the trial court orally acknowledged that, to indemnify for self-negligence, an indemnification agreement must clearly and unequivocally express such an intent. In finding such an expressed intention, and in distinguishing this case from others which had rejected indemnification for self-negligence where only broad language was used, the trial court relied upon the following clause in the agreement:

> The undersigned has inspected the premises and has found the premises to be suitable for his/it's [sic] event, currently planned for (date) Dec. 14, 2005.

On appeal, the State contends that the trial court's reliance upon this clause was misplaced as it merely functioned as an exculpatory clause protecting Estes from later complaints or actions by the University regarding unsuitability of the space. Estes, however, argues that "by including [the last clause], Estes expected and relied upon the University of Memphis to review the areas that they, and their students, may need to use and to assume any risks from the conditions of the property." He contends that if the indemnification agreement is not construed to indemnify him for his own negligence, that it is rendered meaningless because under comparative fault, "Mr. Estes would not have been responsible for th[e] percentage of fault attributable to another[.]" Aside from the language contained within the agreement, Estes further argues that "[t]here is no doubt or controversy that the parties to this agreement, [Mr.] Estes and the University of Memphis Art Department, knew and understood that [the agreement] was intended to eliminate responsibility for [Mr.] Estes from any claim of injury, including his own negligence."

First, we reject any assertion that the agreement's broad language–that the University agreed to indemnify Estes "against *any and all* actions, claims, liabilities," etc.–was sufficient to indemnify Estes for his own negligence. Similar arguments have been readily rejected in several cases. *See e.g., First Am. Nat'l Bank v. Tenn. Gas Transmission Co.*, 428 S.W.2d 35, 39 (Tenn. 1967) (holding that a contractual agreement to "assume the defense of . . . all claims of any kind" was "too general to include damages from negligent acts of the indemnitee"); *Phoenix Ins. Co.*, 2008 WL 5330493, at *8 (finding insufficient to indemnify for landlord self-negligence, a provision to indemnify the landlord against "all expenses, liabilities and claims of every kind"); *HMC Techs. Corp.*, 2000 WL 1738860, at *3 (finding insufficient to indemnify for self-negligence, a provision to hold harmless against "any claim of injury due to either the normal operation or the misuse of the proposed machinery"); *compare Planters Gin Co.*, 78 S.W.3d at 891-93 (finding broad language

sufficient to indemnify a landlord for the negligent acts of the *tenant*). This "general, broad, and seemingly all inclusive language" does not clearly and unequivocally express an intent to indemnify Mr. Estes for his own negligence so as to impose liability upon the University for his culpable conduct. *See Wajtasiak*, 633 S.W.2d at 490; *Phoenix Ins. Co.*, 2008 WL 5330493, at *7.[9]

Next, we consider the effect of the last clause of the indemnification agreement, which the trial court relied upon, and which, again, provides:

> The undersigned has inspected the premises and has found the premises to be suitable for his/it's [sic] event, currently planned for (date) Dec. 14, 2005.

The trial court did not explain its reasoning in concluding that the last clause operated to indemnify Mr. Estes for his own negligence. However, as outlined above, Mr. Estes argues that "[b]y including this language, Mr. Estes expected and relied upon the University of Memphis to review the areas that they, and their students, may need to use and to assume any risks from the conditions on the property."

To contractually indemnify for one's own negligence, an intention to do so must be clearly and unequivocally expressed. *See Kellogg Co.*, 496 S.W.2d at 473 (citing *Kroger Co..* 387 S.W.2d at 472-73). "This, of course, does not mean that the intention must be expressed in terms, but that, if not so expressed, it must otherwise clearly appear in the language used." *Kroger Co.*, 387 S.W.2d at 472-73 (quoting *Buckeye Cotton Oil Co. v. Louisville & Nashville R. Co.*, 24 F.2d 347, 348 (6th Cir. 1928)). Stated another way, the intent to indemnify for one's own negligence must be apparent either from the contract's express language or from a determination that "no other meaning can be ascribed" to the contract. *See Kellogg Co.*, 496 S.W.2d at 474.

The last clause of the indemnification agreement in this case simply does not meet the stringent standards set forth above for indemnifying Mr. Estes from claims stemming from

_____

[9]On appeal, Mr. Estes argues that the parties to the indemnification agreement subjectively intended for the agreement to indemnify Mr. Estes for his own negligence, and Mr. Estes asks this Court to consider the testimony of Mr. Jackson, which he claims supports this contention. Where, however, contract language is unambiguous, we are to garner the parties' intentions by looking only at the contract, itself. *See Planters*, 78 S.W.3d at 890. In any event, because the language of the indemnification agreement itself must clearly and unequivocally express an intent to indemnify for Mr. Estes' own negligence, a finding of ambiguity, such that extrinsic evidence could be considered, would necessarily defeat Mr. Estes' claim for self-negligence indemnity. *See Olin Corp. v. Yeargin Inc.*, 146 F.3d 398 n7 (6th Cir. 1998) (declining to consider extrinsic evidence issue, because "[i]f [the contract language] is ambiguous, we must conclude that the contract does not extend to [the indemnitee's] negligence under Tennessee caselaw[.]").

his failure to exercise ordinary care. Certainly, the clause does not *expressly* indemnify Mr. Estes from claims related to his own negligence, and even if Mr. Estes is correct that the clause could somehow be interpreted to indemnify him for his own culpable conduct, another interpretation could likewise be ascribed to such language. In fact, we find an alternate interpretation more appropriate. In our opinion, a plain reading of the last clause evidences an intention to protect Estes from claims by the University regarding non-suitability of the leased premises–not an intention to indemnify him for his own negligence. In sum, because the last clause does not expressly indemnify Mr. Estes for his own negligence, and because another meaning can be ascribed to such clause, we find that the last clause of the indemnification agreement is insufficient to indemnify Mr. Estes for his own negligent conduct.[10]

### C. Grant of Summary Judgment to the Foundation

Next, we consider whether the trial court erred in granting summary judgment to the University of Memphis Foundation. A trial court's decision to grant or deny a motion for summary judgment presents a question of law. Thus, our review is *de novo* without a presumption of correctness. **Kinsler v. Berkline, LLC**, 320 S.W.3d 796, 799 (Tenn. 2010) (citing *Blair v. W. Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004)). "[W]e must freshly determine whether the requirements of Tenn. R. Civ. P. 56 have been met." **Hunter v. Brown**, 955 S.W.2d 49, 50-51 (Tenn. 1997) (citing *Gonzales v. Alman Constr. Co.*, 857 S.W.2d 42, 44-45 (Tenn. Ct. App. 1993)).

A motion for summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." **Tenn. R. Civ. P. 56.04.** "The party seeking the summary judgment has the burden of demonstrating that no genuine disputes of material fact exist and that it is entitled to a judgment as a matter of law." **Green v. Green**, 293 S.W.3d 493, 513 (Tenn. 2009) (citing *Martin*, 271 S.W.3d at 83; *Amos v. Metro. Gov't of Nashville & Davidson County*, 259 S.W.3d 705, 710 (Tenn. 2008)).

---

[10]In its brief to this Court, the State offers the alternative argument that if the indemnification agreement indemnifies Mr. Estes for his own negligence, such agreement constitutes an improper abrogation of the State's sovereign immunity. Mr. Estes responds by arguing that the State should be estopped from disputing the validity and applicability of the indemnification agreement because, he claims, Jed Jackson induced him into the signing the agreement which the State now claims is beyond Mr. Jackson's authority. Because we have determined that the indemnification agreement does not indemnify Mr. Estes for his own negligence, we need not reach the State's arguments regarding sovereign immunity or the estoppel issue raised by Mr. Estes in response.

"A moving party who seeks to shift the burden of production to the nonmoving party who bears the burden of proof at trial must either: (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial." *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 9 (Tenn. 2008) (footnote omitted). In order to negate an essential element of the claim, "the moving party must point to evidence that tends to disprove an essential factual claim made by the nonmoving party." *Martin*, 271 S.W.3d at 84 (citing *Blair*, 130 S.W.3d at 768). "It is not enough for the moving party to challenge that nonmoving party to 'put up or shut up' or even to cast doubt on a party's ability to prove an element at trial." *Hannan*, 270 S.W.3d at 8.[11] "If the moving party is unable to make the required showing, then its motion for summary judgment will fail." *Martin*, 271 S.W.3d at 83 (citing *Byrd v. Hall,* 847 S.W.2d 208, 215 (Tenn. 1993)).

If the moving party does make a properly supported motion, "[t]he non-moving party must then establish the existence of the essential elements of the claim." *McCarley v. West Quality Food Serv.,* 960 S.W.2d 585, 588 (Tenn. 1998). The nonmoving party is required to produce evidence of specific facts establishing that genuine issues of material fact exist. *Martin*, 271 S.W.3d at 84 (citing *McCarley,* 960 S.W.2d at 588; *Byrd,* 847 S.W.2d at 215). "The nonmoving party may satisfy its burden of production by: (1) pointing to evidence establishing material factual disputes that were over-looked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P., Rule 56.06." *Id.* (citing *McCarley,* 960 S.W.2d at 588; *Byrd,* 847 S.W.2d at 215 n.6). "The nonmoving party's evidence must be accepted as true, and any doubts concerning the existence of a genuine issue of material fact shall be resolved in favor of the nonmoving party." *Id.* (citing *McCarley,* 960 S.W.2d at 588).

On appeal, Mr. Estes and Austin Wells argue that the trial court erred in granting summary judgment to the Foundation based upon its conclusion that the Foundation had negated the "duty" element of Austin Wells' claim.[12] "In order to establish a prima facie

---

[11]Recently, the Tennessee General Assembly enacted a law that legislatively reversed the Tennessee Supreme Court's holding in *Hannan*. *See* Tenn. Code Ann. § 20-16-101. However, the statute applies only to cases filed on or after July 1, 2011. Thus, in this appeal, we apply the summary judgment standard set forth in *Hannan*.

[12]Generally, "negligence cases are not amenable to disposition on summary judgment." *Fruge v. Doe,* 952 S.W.2d 408, 410 (Tenn. 1997) (citing *McClenahan v. Cooley,* 806 S.W.2d 767, 775–76 (Tenn. 1991); *Keene v. Cracker Barrel Old Country Store, Inc.,* 853 S.W.2d 501, 502–03 (Tenn. Ct. App. 1992)).
(continued...)

-16-

claim of negligence, basically defined as the failure to exercise reasonable care, a plaintiff must establish the following essential elements: '(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause.'" *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)). "While individuals have an obligation to refrain from acting in a way that creates an unreasonable risk of harm to others, the law generally does not impose on individuals an affirmative duty to aid or protect others." *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 819 (Tenn. 2008) (citing *Draper v. Westerfield*, 181 S.W.3d 283, 291 (Tenn. 2005); *Bradshaw v. Daniel*, 854 S.W.2d 865, 871 (Tenn. 1993); Restatement (Second) of Torts § 314 (1965)). However, exceptions to the general "no duty to act" rule have been carved out. *See id.* (citing *Bradshaw*, 854 S.W.2d at 872; *McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891, 904 (Tenn. 1996); Restatement (Second) of Torts § 314A). "For example, if an individual stands in a special relationship to another individual who is the source of the danger or who is foreseeably at risk from the danger, then the individual assumes an affirmative duty to exercise reasonable care to either control the danger or protect the vulnerable." *Id.* at 819-20 (citing *West*, 172 S.W.3d at 551; *Biscan v. Brown*, 160 S.W.3d 462, 478-79 (Tenn. 2005)).

In considering whether a defendant owes a duty of care to a particular plaintiff, Tennessee courts consider both public policy and whether the risk of harm is unreasonable. *Downs*, 263 S.W.3d at 820 (citing *Burroughs v. Magee*, 118 S.W.3d 323, 329 (Tenn. 2003); *Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn. 1997)). "Public policy considerations are relevant because 'the imposition of a legal duty reflects society's contemporary policies and social requirements concerning the right of individuals and the general public to be protected from another's act or conduct.'" *Id.* (quoting *Bradshaw*, 854 S.W.2d at 870). Additionally, as stated by our Supreme Court:

> The foreseeability of the harm is a key factor in the equation because, in general terms, "[f]oreseeability is the test of negligence." "'A risk is foreseeable if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom is owed a duty is probable.'" However, foreseeability alone does not create a duty to exercise reasonable care. If the risk is foreseeable,

_____

[12](...continued)
However, any civil case, including a negligence case, may be resolved at the summary judgment stage if the matter "can be and should be resolved on legal issues alone." *Id.* (citing *Mansfield v. Colonial Freight Sys., 862 S.W.2d 527 (Tenn .Ct. App. 1993)).

then courts should weigh the remaining factors to determine if an imposition of duty is justified. In the end, whether a defendant owed or assumed a duty of care to a plaintiff is a question of law for the court to decide.

*Id.* (internal citations omitted).

The portions of Austin Wells' and Estes' appellate briefs concerning the grant of summary judgment to the Foundation are somewhat scattered and difficult to follow. However, the parties seem to argue that the Foundation owed a duty of care to Austin Wells based upon a special relationship between the Foundation, the University, and Austin Wells, and/or based upon an agent/principal or alter-ego relationship between the University and the Foundation. They also argue that the agent/principal and/or alter-ego relationship between the Foundation and the University serves to impute to the Foundation, any knowledge of the University regarding potential safety issues and/or the upcoming occurrence of the December 2005 event.

In their briefs, Austin Wells and Estes cite the Foundation's "Charter of Incorporation" ("Charter") in support of their argument that a special relationship existed between Austin Wells, the University, and the Foundation. The Charter provides in relevant part that

> The general purposes for which this Association is formed within the purview of the Tennessee General Corporation Act, are *for the general welfare of society*, and not for individual profit[.]

> More specifically, the purposes are in general *to promote and support*, literary, scientific, educational scholarship, research, charitable and developmental purposes and *objects at the University*[.]

(emphasis added). According to Austin Wells, "[i]t is the mission of the Foundation to support [activities such as the exhibit]" and "[t]hat mission also creates a duty to act reasonably by those charged with that mission." Thus, he claims, the special relationship "created a duty on the part of the Foundation to exercise reasonable care to either control the danger and/or protect Wells from unreasonable risks at the gallery[.]"

Regarding considerations relevant to the duty determination, Wells maintains that the condition of the freight elevator in Mr. Estes' building posed an unreasonable risk of harm

and that numerous feasible alternatives–including holding the exhibit on campus or in another off-campus location or inspecting the facility and remedying deficiencies–existed to holding the exhibit at Mr. Estes' property. Additionally, he contends that the harm was foreseeable, and he points out that the University had leased the Second Floor Contemporary Gallery in September 2005, three months prior to the incident, with funds held by the Foundation. Without citation to the record, Austin Wells claims that "[Jed] Jackson and [assistant art department chair Calvin] Foster testified that they had been to the gallery numerous times prior to December 2005[.]" Thus, according to Wells, these University officials "should have known about this dangerous condition and the unreasonable risk the location posed when [the location] was contemplated for the senior show in December 2005, particularly if students needed to use the elevator[,]" and "[a]ll of this knowledge is imputed to the Foundation as these individuals were agents of the Foundation." Wells also points to the deposition testimony of University President Dr. Shirley Raines, who stated that when a University event is paid for out of Foundation funds, the Foundation relies upon the party holding the event–presumably a University representative–to make all of the necessary arrangements. He also cites the testimony of the Foundation's managing director, Larry Bunch, who, when questioned regarding the safety policies in place when the Foundation supplies funds for University events involving alcohol, responded "We rely on the party or parties holding the event and we don't do anything." Wells apparently contends that the University was monitoring safety concerns, and the knowledge/foreseeability it uncovered was imputed to the Foundation as principal and/or alter ego of these University representatives.

On appeal, Estes similarly argues that the Foundation owed a duty of care to Austin Wells based upon an alleged agency relationship between the University and the Foundation. Estes contends that because "[t]he Foundation exists as a means for the University to obtain and hold funding, which [the University] may use at its discretion[,]" the Foundation "acts simply as an agent of the University, or . . . [its] financial alter ego[.]" Estes maintains that, at a minimum, a question of fact exists regarding whether an agency relationship exists between the Foundation and the University such that the University's alleged knowledge of safety issues could be imputed to the Foundation.

Estes also contends that the Foundation owed a duty of care to Austin Wells based upon the Foundation's Charter and its Code of Ethics, which states, in part:

> Responsibilities of Board Members: All Board members serve the public trust and have a clear obligation to fulfill their responsibilities in a manner consistent with this role. Therefore, Board members shall:
>
> • Make decisions based on the best interests of the University of

-19-

> Memphis, the University of Memphis Foundation and the public good
> and trust[.]

Estes contends that, pursuant to its Charter and Code of Ethics, "the Foundation has a duty to the public good in fulfilling their responsibilities in a manner consistent with the public good[,]" and that factual questions exists as to whether the Foundation's decision "to not review, investigate or confirm information relating to activities which it makes possible through its funding efforts" is a breach of such duty.

In response, the Foundation argues that it merely acts as a bank, disbursing held funds–without discretion–to specific University departments.

The Foundation's statement of undisputed facts, and the responses thereto, demonstrate the following: The Foundation and the University are separate legal entities, the Foundation being chartered in Tennessee and acting as a not-for-profit, tax-exempt corporation. The Foundation assists the University, and the Foundation would not exist if it did not have the purpose of helping the University. The Foundation exists primarily to manage endowment and other funds and to distribute the funds and income as designated by the University of Memphis for projects and programs to promote academic enrichment. The Foundation manages, holds and distributes funds donated and/or allocated to departments at the University of Memphis. The funds managed and held by the Foundation are received as private donations from individuals, corporations, foundations, and other entities. The Foundation holds money in various accounts for departments within the University. Some funding received by the Foundation is restricted to certain purposes, and some is discretionary money that can be spent for the benefit of a department at the Dean's discretion.

Any College or Department at the University which has a Foundation account can execute an Expenditure Request Form in order to direct that payment or reimbursement be made from a specific fund or account held at the Foundation. In order to receive payment or reimbursement from the specific fund or account held at the Foundation, an Expenditure Request Form must be approved and signed by the appropriate individual at the University who has expenditure authority over the specific fund or account from which the funds are being requested. When the Foundation receives an approved Expenditure Request Form with the necessary supporting information and/or documentation, the Foundation reviews and verifies the fund or account name, account identification number, the availability of the funds, the appropriate signatures, and the appropriate supporting information and/or documentation. If any information is missing from an Expenditure Request Form or its necessary supporting information and/or documentation, the Foundation contacts the College or Department at the University which submitted the form and notifies them of the deficiency

and the action needed to remedy the deficiency. Once the Expenditure Request Form is complete and includes all necessary supporting information and/or documentation, the Foundation staff members input the information from the Form and process the request for payment or reimbursement from the specific fund or account as indicated by the requesting party. The Foundation then distributes a check from the appropriate fund or account of the requesting party to the recipient of the funds as requested in the Expenditure Request Form. The Foundation maintains that when a proper request is made, it lacks discretion to approve or deny payment or reimbursement; however, Mr. Estes and Austin Wells contend that although the Foundation may elect not to exercise its discretionary power, "under the charter the Foundation has broad power that would support such discretion." Foundation managing director Larry Bunch testified that the Foundation, as an entity, does not hold, sponsor, fund, or approve any events, and it has no involvement or control over the decision to have any events. However, he also agreed that characterizing the Foundation as only a "bank or escrow agent for the university . . . would not be a complete description" because "there [are] a lot of activities authorized by the charter that the Foundation doesn't currently do and maybe hasn't done in the past" including the authority to build, buy, or rent buildings. The Foundation does not inspect or ensure any premises to be safe, and instead, it leaves this function to the party holding the event.

In September 2005, the Foundation disbursed monies that had been donated for the benefit of the Department of Art to fund an event at Mr. Estes' building, specifically the gallery rental, food, and alcohol. With regard to the December 2005 event at issue, the University art department received an invoice for the gallery rental, which it approved and then submitted to the University Accounting Office for payment five days prior to the event. The University Accounting Office–not the Foundation–then issued a check for the rental. The Foundation did, however, reimburse the University art department for the cost of alcohol served at the December 2005 event. The Foundation claims that it did not become aware of the exhibit until after it occurred; however, Mr. Estes and Austin Wells dispute this assertion, pointing to the testimony of University art department chair Jed Jackson who erroneously believed the December 2005 lease had been paid by the Foundation.

In its order granting summary judgment to the Foundation, the trial court ruled, in part, as follows:

The defendant Foundation was and still is a separate legal entity from the defendant University of Memphis. The Foundation's general purposes include, but are not limited to, supporting and promoting any literary or scientific undertaking as a college or university, with powers to confer degrees, establishment of library, educational scholarships, to solicit, hold invest and disburse funds that have been

-21-

donated for specific purposes or to specific departments at the University of Memphis.

On December 20, 2005, the defendant Foundation first learned of the exhibition. On that same date, the University of Memphis Accounting Office issued a check to defendant Estes for the rental of the 431 South Main Street Gallery. However, the Foundation paid for the refreshments for the event, after it received an invoice from the University of Memphis College of Arts for payment.

The Foundation does not hold, sponsor or approve events and has no involvement or control over the decision to have or hold events. The Foundation does process invoices sent by the University for payments of expenditures signed by a University official who has authority to request a disbursement.

In September 2005, the Foundation had paid for the rental of the 431 South Main Street facility for an art exhibition sponsored by the University of Memphis College of Arts, after an invoice was presented to it. For reasons not explained, the Foundation did not pay for the December 14, 2005 exhibition. Historically, as long as money exists in a specific account, the Foundation has made the expenditure for a properly supported invoice submitted from an appropriate University of Memphis official.

This Court finds that there was no duty of care owed by the defendant Foundation to plaintiff Wells. First of all, the Foundation, an entity separate and apart from the defendant University, was not aware of the event until after plaintiff suffered his injuries. It follows that the Foundation could not have breached a duty to plaintiff of which it was unaware. Further, the Foundation had no control over the event itself. Therefore, it had no duty to inspect the gallery location for safety reasons. That responsibility rested with the sponsor of the event, in this case, the Chairman of the Department of Art, Jed Jackson or those working for or with him. In addition, the record shows that the Foundation did not learn of plaintiff Wells' injuries until 2009.

If there were problems with the gallery facilities in September 2005, such knowledge should not be imputed to the Foundation. The Foundation's role in this instance was to pay the invoice, if properly presented and documented. Further, the agreement signed by Jed Jackson and defendant Estes stated that the building was safe and had been inspected. Such knowledge by Mr. Jackson would be and should be imputed to the University of Memphis, not the Foundation in its limited role, in this

case, of paying invoices for refreshments.

The Court further does not find that the Foundation was a principal of any University of Memphis employees, or was the "alter ego" of the University of Memphis in its limited role in this case.

Considering all the submissions reviewed and arguments of the attorneys, the Court finds no genuine issue of material fact as it relates to the Foundation. The Foundation has negated an essential element of plaintiff's claim, mainly the element of duty owed to the plaintiff. Plaintiff has not been able to establish or create a genuine issue of a material fact as it relates to [the] Foundation's duty owed to plaintiff.

We find it unnecessary to consider whether the Foundation is the agent of the University because "knowledge of an agent is imputed to his principal"–not vice versa. *See Griffith Motors, Inc. v. Parker*, 633 S.W.2d 319, 322 (Tenn. Ct. App. 1982). However, we must consider whether the Foundation is the principal of the University or University representatives or whether the two serve as alter egos of one another.

"The concept of agency, in its broadest sense, includes every relation in which one person or entity acts for or represents another." *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 653 (Tenn. 2009) (citations omitted). "The existence of an agency relationship 'does not require an explicit agreement, contract, or understanding between the parties.'" *Hagan v. Phipps*, No. M2010-00002-COA-R3-CV, 2010 WL 3852310, at *4 (Tenn. Ct. App. Sept. 28, 2010) (citing *White v. Revco Disc. Drug Ctrs., Inc.*, 33 S.W.3d 713, 723 (Tenn. 2000)). "An agency relationship will be found to exist if the facts establish it, whether that was the intention of the parties or not." *Id.* (citing *White* 33 S.W.3d at 723). To determine whether an agency relationship exists, the court examines the parties' relationship and their conduct. *McInturff v. Battle Ground Academy of Franklin*, No. M2009-00504-COA-R3-CV, 2009 WL 4878614, at *2 (Tenn. Ct. App. Dec. 16, 2009) (citations omitted). "The right to control the conduct of the agent is the essential test in determining whether an agency relationship exists." *Id.* (quoting *Jack Daniel Distillery v. Jackson*, 740 S.W.2d 413, 416 (Tenn. 1987)). "'Whether an agency relationship exists 'is a question of fact under the circumstances of the particular case[.]''" *Id.* (quoting *McCay v. Mitchell*, 62 Tenn. App. 424, 463 S.W.2d 710, 715 (Tenn. Ct. App. 1970)).

"Parent and subsidiary corporations are presumed to be separate and distinct legal entities." ***Gordon***, 300 S.W.3d at 651 (citations omitted). "However, the actions of a parent corporation may be attributable to a subsidiary corporation (1) when one corporation is acting as an agent for the other or (2) when the corporations are essentially alter egos of each other." ***Id.*** at 652 (footnote and citation omitted). "An alter ego or agency relationship is typified by the parent corporation's control of the subsidiary corporation's internal affairs or daily operations." ***Id.*** (citing *Does v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001)). "The courts have declined to disregard the presumption of corporate separateness in the absence of evidence of the parent corporation's domination of the day-to-day business decisions of the subsidiary corporation." ***Id.*** (footnote and citations omitted). The existence of an alter-ego relationship is a question of fact. ***See Bracken v. Earl***, 40 S.W.3d 499, 502 (Tenn. Ct. App. 2000) (citing *Electric Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985)).

We begin by determining whether the Foundation, the party moving for summary judgment, successfully shifted the burden of production by negating the existence of an agency or alter-ego relationship between itself and the University. In its brief to this Court, the Foundation does not expressly address the agency issue; however, in arguing that the University and the Foundation are not alter egos of one another, the Foundation points out that the two are separate entities and it argues that the University does not control the Foundation. Regarding control, the Foundation notes that it, undisputedly, does not simply rubber-stamp monetary requests made by the University, instead requiring the completion of an Expenditure Request Form, including the necessary supporting signatures and/or documentation. Elsewhere in its brief, it points to the deposition testimony of Foundation managing director Larry Bunch, who stated that the Foundation does not hold, sponsor, fund, or approve any events, and it has no involvement or control over the decision to hold events; however, he acknowledged that "there is a lot of activities authorized by the charter that the Foundation doesn't currently do and maybe hasn't done in the past [sic]."

We disagree with the trial court's conclusion that the Foundation was entitled to a summary dismissal of the negligence claim against it. As stated above, for purposes of summary judgment, we must consider the evidence in the light most favorable to the non-moving party. ***Martin***, 271 S.W.3d at 84 (citation omitted). The existence of an agency or alter-ego relationship is a question of fact, and we cannot say that the evidence establishes the absence of either as a matter of law. To support its argument against agency or alter-ego findings, the Foundation has somewhat contradictorily argued that it is not subservient to the University, yet it also claims that it lacks discretion to deny monetary requests made by the University.

In its appellate brief, the Foundation argues that "Plaintiff and the Estes Defendants have presented absolutely no evidence to establish an alter ego theory under Tennessee law[,]" and it claims that the evidence presented by Mr. Estes and Austin Wells indicating that the Foundation's "assistance" of, and existence to promote, the University, is insufficient to find an alter-ego relationship. However, the Foundation cannot succeed on its motion for summary judgment by "challeng[ing] th[e] nonmoving party to 'put up or shut up' or even to cast doubt on a party's ability to prove an element at trial." *Hannan*, 270 S.W.3d at 8.

We find that the Foundation has not affirmatively demonstrated the absence of an alter-ego or agency relationship in this case. Moreover, the record contains facts supporting an agency relationship–such as University representatives acting as ensurers of safety for events paid for with funds held by the Foundation–as well as facts supporting an alter-ego theory–such as the Foundation's existence to support the University and the Foundation's argued lack of discretion to withhold funds properly requested by the University. Resolution of the agency and alter-ego issues require the weighing of evidence, which is not an appropriate task for summary judgment. Because the issues of agency and alter-ego cannot be resolved here as a matter of law, and resolution of these issues is essential to both the foreseeability consideration and the ultimate duty determination, Plaintiff's negligence claim cannot be dismissed at the summary judgment stage. Accordingly, the trial court's grant of summary judgment to the Foundation is reversed.

### D. Damage Cap

Finally, we address whether the trial court erred in capping the University's liability at $300,000.00 pursuant to Tennessee Code Annotated section 9-8-307(e), which provides, in relevant part, that "[f]or causes of action *arising in tort*, the state shall only be liable for damages up to the sum of three hundred thousand dollars ($300,000) per claimant and one million dollars ($1,000,000) per occurrence." (emphasis added).

On appeal, Austin Wells argues that the statutory cap does not apply because (1) although his complaint against the University alleged a negligent tort claim, it also included a breach of contract claim, for which, he contends, the statutory cap does not apply; and (2) the plain language of the indemnification agreement requires the University to be responsible for "all" damages. In response, the State argues that Austin Wells was not a proper claimant in the Claims Commission on his breach of contract claim because he is neither a party to, nor a third party beneficiary of, the Indemnification Agreement. It further argues that the

Indemnification Agreement does not operate to impose liability upon the State beyond the statutory cap because, it contends, the agreement is void and because Austin Wells' rights under the agreement can be no greater than Estes'–and Estes has no rights under the agreement regarding the liability of the State for its own negligence.

In his complaint against the University, Austin Wells asserted a claim for breach of contract based upon the University's refusal to indemnify Mr. Estes for his own negligence. Austin Wells is correct that the statutory damage cap applies only to *tort* claims brought against the State. **Tenn. Code Ann. § 9-8-307(e)**. However, the trial court's Order of Judgment indicates that it is an "Order on Liability of State for *Tort* Damages" and it sets the State's percentage of fault at 40% of the $4,103,472.00 verdict, or $1,641,388.00, and it caps its monetary liability at $300,000.00 The order indicates that liability was imposed against the State strictly on tort theories, and therefore, Austin Wells' first basis for attacking the damage cap is without merit.

We, likewise, reject Austin Wells' contention that he may enforce the indemnification agreement–between the State and Estes–in order to recover the full amount of damages assessed against the State. To confer third-party beneficiary rights, "[a] contract entered into by a governmental entity requires a showing that the contract was intended by the parties to confer a direct obligation to identifiable third-party entities." *Coburn v. City of Dyersburg*, 774 S.W.2d 610, 612 (Tenn. Ct. App. 1989). "Only when such a contract manifests a specific intent to grant individual citizens enforceable rights thereunder may a citizen claim such rights as a third-party beneficiary." *Id.* (citing *Berberich v. United States*, 5 Cl.Ct. 652, 656 (1984), *aff'd*, 770 F.2d 179 (Fed. Cir. 1985)).

The indemnification agreement in this case was not formed for the benefit of Austin Wells; its stated purpose was to "indemnify, defend, and hold free and harmless, Don Estes, individually, and Estes, L.L.C., of 431 South Main St., Memphis, Shelby County, Tennessee 38103 and each of his or their agents, servants, employees, assigns[.]" Because the agreement manifests no specific intent to create enforceable rights in persons who may be injured by the conduct of the indemnitee or indemnitees, Austin Wells may not properly rely upon the indemnification agreement to impose full liability against the State.

## IV.  CONCLUSION

For the aforementioned reasons, we find that the trial court erred in concluding that the indemnification agreement indemnified Mr. Estes for his own negligence and in granting summary judgment in favor of the Foundation.  However, we affirm the trial court's admission of testimony regarding $410,000 in medical bills, its exclusion of evidence regarding Austin Wells' alleged drug use, and its capping of the State's liability at $300,000. The case is remanded for a determination of the Foundation's liability, if any, and for a reallocation of fault, if necessary.  Costs of this appeal are taxed equally to Austin Wells, by and through his conservator and natural mother, Carron C. Wells Baker, Donald L. Estes and Estes, LLC, and the University of Memphis Foundation, and their sureties, for which execution may issue if necessary.

_____

ALAN E. HIGHERS, P.J., W.S.