# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### January 11, 2022 Session

## SOUTHERN STEEL & CONCRETE, INC. v. SOUTHERN STEEL & CONSTRUCTION, LLC, ET AL.

**Appeal from the Chancery Court for Shelby County**
**No. CH-17-0148      Jim Kyle, Chancellor**

_____

### No. W2020-00475-COA-R3-CV

_____

This appeal involves a payment dispute among several companies, including a construction company, a concrete company, and a fabricator company, that ultimately centered on a question of alter-ego status.  The trial court found that the concrete company and the construction company were one and the same, and therefore were alter egos of each other. The trial court granted the concrete company enforcement of its lien and awarded it the funds that were deposited in the clerk's office for the work performed on a building project. The trial court also denied the fabricator company's cross-claim against the construction company for breach of contract for subcontracting work to the concrete company.  The concrete company appeals.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and THOMAS R. FRIERSON, II, J., joined.

Linda J. Mathis, Memphis, Tennessee, for the appellant, Southern Steel & Concrete, Inc.

Adam M. Nahmias, Memphis, Tennessee, for the appellee, Southern Steel & Construction, LLC.

Joseph T. Getz, Elizabeth B. Stengel, and Charles W. Cavagnaro, Jr., Memphis, Tennessee, for the appellee, Quality Iron Fabricators, Inc.

## OPINION

### I.     FACTS & PROCEDURAL HISTORY

This case involves three companies in a payment dispute: Southern Steel & Construction, LLC ("SS Construction"); Southern Steel & Concrete, Inc. ("SS Concrete"); and Quality Iron Fabricators, Inc. ("Quality Iron").[1]  We begin this opinion with a brief timeline of how this dispute came to be.  Around 1988, Mr. J. Warren Brock and Mr. Morris Rutledge began working together when Mr. Rutledge became an employee at Memphis Steel & Construction, Inc. ("Memphis Steel").  Memphis Steel was formed by Mr. Brock in 1983, but it ultimately went out of business sometime in 2004.  Thereafter, the ownership roles of Mr. Brock and Mr. Rutledge were reversed.  Mr. Brock discussed with Mr. Rutledge the possibility of forming a new company "to keep people working and keep making money."  Mr. Rutledge formed SS Construction in March 2004, and Mr. Brock became an employee.  From 2004 until 2016, Mr. Brock handled a number of management aspects and helped Mr. Rutledge run the business.  Mr. Brock was SS Construction's vice president at one time and executed subcontracts as SS Construction's "CEO."  While still employed by SS Construction, Mr. Brock formed SS Concrete in June 2015 partly because he was unsure if SS Construction was going to survive its financial instability.

SS Construction performed a substantial amount of its work for Quality Iron, which was one of its largest clients.  Quality Iron would bid on work from general contractors and would be charged with the steel fabrication, delivery, and installation for different structures.  Quality Iron primarily performed the steel fabrication work and would subcontract the steel erection work to subcontractors such as SS Construction.  For more than a decade, the two companies enjoyed a working relationship.  They had a team approach to completing projects together and had a history of reconciling any issues.  However, their working relationship unfortunately did not remain as true as the steel they were fabricating and erecting.  After becoming involved with work on the FedEx Memphis New Line MX Buildings ("FedEx Project"), a payment dispute arose and their relationship deteriorated.

The FedEx Project consisted of work on eight buildings: four of them were to be erected in 2015 and four of them were to be erected in 2016.  Chris Woods Construction Company, Inc. ("CW Construction") served as the general contractor responsible for the overall construction of the FedEx Project.  In April 2015, CW Construction subcontracted the steel fabrication and erection work to Quality Iron.  Quality Iron then subcontracted the steel erection work to SS Construction.  By January 2016, work remained on four buildings.  SS Construction then subcontracted with SS Concrete to complete the remaining steel erection work on the FedEx Project.  SS Construction issued two purchase orders assigning its work remaining under the subcontract to SS Concrete.  However, Quality Iron claims that it did not become aware of SS Concrete's involvement with the FedEx Project until SS Concrete made a claim for payment several months later.  SS Concrete performed work on the FedEx Project from February 2016 until October 2016.  Although the work was

---

[1] While the record in this case is extensive, we focus on the facts pertinent to the sole issue presented for this Court's review.

timely completed and there were no workmanship issues, SS Concrete was never paid.

SS Construction made several requests for payment to Quality Iron in order to pay SS Concrete for its work. However, Quality Iron eventually informed SS Construction that it was rejecting the demand for payment based on SS Construction's failure to perform and meet its contractual obligations concerning another project. In October 2016, SS Concrete mailed a notice of nonpayment to Quality Iron and SS Construction laying out a claim for the payment it was owed. SS Concrete mailed another notice of nonpayment in December 2016. SS Construction ceased doing business in 2016 and was administratively dissolved in 2017.

On February 2, 2017, SS Concrete filed a complaint seeking payment from Quality Iron, SS Construction, Federal Express Corp., CW Construction, and Suretec Insurance Co., for its work performed on the FedEx Project.[2] Additionally, SS Concrete sought enforcement of its lien to secure the payment. Around this time, SS Construction mailed a letter to SS Concrete in response to the notice of nonpayment. The letter explained that the only reason SS Construction had not paid SS Concrete was due to "the wrongful failure and refusal of Quality Iron to pay" SS Construction for the work performed by SS Concrete. SS Construction then filed an answer to the complaint in March 2017. In June 2017, Quality Iron also filed an answer to the complaint and asserted a cross-claim against SS Construction for breach of contract.

In August 2017, SS Concrete filed a motion for summary judgment claiming there were no genuine issues of material fact and that it was entitled to payment. Quality Iron filed a response arguing that genuine issues of material fact existed as to whether SS Concrete and SS Construction were alter egos of each other and should be treated as the same entity. Quality Iron contended that SS Construction operated as a "pass-through" company for SS Concrete so it could perform work on construction projects such as the FedEx Project. Quality Iron also asserted that Mr. Brock "exercised complete control over both SS Construction and SS Concrete." The trial court held a hearing on the motion for summary judgment in October 2017. In November 2017, the trial court entered an order denying SS Concrete's motion for summary judgment on the grounds that Quality Iron presented sufficient material facts to establish a genuine issue regarding whether SS Concrete was the alter ego of SS Construction and should be treated as the same entity. After a period of extensive discovery, Quality Iron filed a motion for partial summary judgment in May 2019 on the issue of whether SS Concrete was the alter ego of SS Construction. In December 2019, the trial court denied the motion.

---

[2] Three of these parties were subsequently dismissed. Federal Express Corp. was dismissed from this action in June 2017. In September 2017, CW Construction won a motion for summary judgment and was dismissed from this action due to its interpleader of funds. Suretec Insurance Co. was dismissed from this action in November 2020.

The trial court held a trial in February 2020. Mr. James Cole testified as the business manager for the Iron Workers Local Union No. 167 ("the Union"). As business manager for the Union, Mr. Cole managed the manpower for all of the signatory contractors across the Memphis area. He explained that a signatory contractor would sign a collective bargaining agreement with the Union and the Union would provide iron workers from their pool of personnel for jobs in the Memphis area. He was familiar with both SS Construction and SS Concrete because they had signed collective bargaining agreements with the Union in the past. He stated that the two companies had separate signatory contracts with the Union. However, he stated that it was not unusual for signatory contractors, such as SS Construction and SS Concrete, to hire the same workers for different jobs because they were hiring from the Union's pool of personnel consisting of approximately 180 active workers. He further explained that SS Construction and SS Concrete had separate signers, employee identification numbers, federal tax ID numbers, and debts owed to the Union. He stated that Mr. Rutledge guaranteed the debts of SS Construction and Mr. Brock guaranteed the debts of SS Concrete. When dealing with these two companies, he visited their business offices at separate addresses as well. SS Construction operated from the "Tylertown" address in Bartlett, Tennessee, and SS Concrete operated from the "West Olive" address in Memphis, Tennessee. For these reasons, he testified that he never treated SS Construction and SS Concrete as one and the same.

Mr. Brock testified as the president of SS Concrete and the former employee of SS Construction. After he attended an apprentice program and worked for several companies, he formed Memphis Steel in 1983. From around 1988 to 2004, Mr. Rutledge worked for Memphis Steel. However, in 2004, Memphis Steel went out of business because it owed a considerable amount of money and could no longer operate. Thereafter, Mr. Rutledge formed SS Construction, where Mr. Brock became employed. Mr. Brock did everything from invoicing and estimating jobs to managing projects and employees, but had to answer to Mr. Rutledge for the most part. He also signed contracts on behalf of SS Construction, but had to get Mr. Rutledge's approval before signing. He was responsible for "99.5% of the estimates." He was employed by SS Construction from 2004 until 2016.

In June 2015, Mr. Brock formed SS Concrete and was its registered agent, incorporator, and president. He stated that he was the sole owner of SS Concrete and handled all aspects of the company. He started SS Concrete partly because he wanted to start a business again, but he was also unsure if SS Construction was going to survive its financial instability. Despite his nascent company, he remained involved with SS Construction and continued to help Mr. Rutledge run the business. Before the FedEx Project, he explained that SS Concrete worked on several different projects: Pink Palace; Sheehan Pumping Station; I-55 Welcome Center; 60 Madison Avenue; Iberia Bank; Crawford County Jail; Berclair School; Westhaven School; and Well Station School. He admitted that SS Concrete and SS Construction worked together on all of these projects because SS Construction subcontracted the work to SS Concrete. He stated that the two companies had "an agreement." This agreement was that SS Concrete could "subcontract

- 4 -

back" to SS Construction. However, SS Concrete worked on other projects that did not involve SS Construction.

In January 2016, SS Concrete became involved with the FedEx Project because Mr. Rutledge did not believe that SS Construction could continue to finance the labor and equipment to complete the project. Mr. Brock, as president of SS Concrete, made the decision to work for SS Construction as a subcontractor to complete the work. SS Construction issued two purchase orders to SS Concrete in order to complete the remaining work on the FedEx Project. Mr. Brock testified that he was aware of the work SS Construction had already completed on the FedEx Project because he estimated and managed the project on behalf of SS Construction. He also testified that Quality Iron was aware that SS Concrete became involved with the FedEx Project at that time. He explained that he spoke with the project manager and informed him that SS Concrete was going to complete the work. He testified that he also spoke with the vice president of CW Construction. However, SS Construction did not obtain prior written consent of its assignment of the remaining work to SS Concrete, which was required by the contract between SS Construction and Quality Iron.

SS Concrete began work on the FedEx Project in February 2016 and completed its work in October 2016. During this time period, Mr. Brock was aware that Quality Iron was refusing to pay SS Construction for its work as early as April 2016. However, he believed that there would be a resolution between Quality Iron and SS Construction as they had always reconciled issues in the past. Once the work was completed on the FedEx Project, SS Concrete "demobilized" from the job site. Mr. Brock stated that there were no issues with SS Concrete's work. He explained that "[w]e coordinated all work through Quality [Iron] and through the superintendent with [CW] Construction. We performed our work on schedule and with the quality of work that was required by the plans and specifications." He stated that there were no issues of timeliness or defects. He explained that SS Concrete paid for all of the labor and materials for its work on the project and did not owe anyone. Despite completing the work on the FedEx Project, he testified that SS Concrete had been paid "zero" for its work. Therefore, SS Concrete made the decision to file this lawsuit.

In regard to the allegation that SS Construction and SS Concrete were one and the same, Mr. Brock stated that he did not have any financial or ownership interest in SS Construction. He also stated that he never prepared any corporate documents, was not a signatory on the checking account, and was a mere W-2 employee for SS Construction. While he was authorized to sign contracts on behalf of SS Construction, he reiterated that he had to seek Mr. Rutledge's approval first. Conversely, he explained that Mr. Rutledge did not have any financial or ownership interest in SS Concrete. Mr. Rutledge never prepared any corporate documents, was not a signatory on the checking account, and was a mere W-2 employee for SS Concrete. Furthermore, the two companies had separate offices and separate checking accounts. While SS Construction and SS Concrete had two

- 5 -

separate addresses for their business offices, Mr. Brock admitted that he used the "West Olive" address as the address for SS Construction when he signed some of the subcontracts for projects with Quality Iron. One of these subcontracts was for the FedEx Project. The subcontract for the FedEx Project included a phone number for SS Construction, which was the same phone number used by SS Concrete. Moreover, Mr. Brock included the "West Olive" address in correspondence with Quality Iron and admitted that he did so on behalf of SS Construction. He admitted that he made requests for payment on behalf of SS Construction, which in turn would help him get paid at SS Concrete. He also admitted that SS Construction and SS Concrete never bid on work against each other. Although SS Concrete had been in operation since June 2015, he explained that he continued to perform management duties on behalf of SS Construction as late as May 2016. Therefore, Quality Iron was still sending him documentation for the FedEx Project in his capacity as an employee of SS Construction.

In regard to using the same employees, Mr. Brock explained that SS Concrete was required to use the Union employees because it was a signatory contractor. Therefore, it was inevitable that SS Construction and SS Concrete would be using some of the same employees because they were both pulling from the Union's pool of personnel. Additionally, Mr. Brock stated that he had to request some workers by name due to the location of the work on the FedEx Project. He explained that he needed workers with the necessary security clearances because the FedEx Project was located on an airport runway. In regard to using the same equipment, Mr. Brock stated that SS Construction never sold, gifted, or transferred any of its equipment to SS Concrete. Rather, SS Concrete leased its equipment from a leasing company, but some of the equipment had been used by SS Construction at one time. Mr. Brock also stated that he personally owned some of the equipment, which explained why the two companies had used some of the same equipment. SS Construction and SS Concrete used the same insurance company as well. In SS Concrete's insurance policy, virtually all of the insured equipment had been previously insured on SS Construction's insurance policies. SS Construction and SS Concrete had identical insurance policies with identical coverage. Additionally, the certificates of liability insurance for both companies included the "West Olive" address.

On an ERM-14 form,[3] SS Construction and SS Concrete were listed as two separate entities. However, both companies listed Mr. Brock as the contact person and provided the same physical address, email address, and phone number. The form stated that SS Concrete's owner, Mr. Brock, was a "key employee" of SS Construction. Furthermore, the form stated that SS Concrete "does the same work with the same people and equipment" as SS Construction. The form also noted that Mr. Rutledge was an employee of SS Concrete at the time.

Mr. Rutledge testified as the owner of SS Construction and an employee at SS

---

[3] An ERM-14 form is used to request ownership information.

Concrete. After his time at Memphis Steel, he formed SS Construction in 2004. At SS Construction, he explained that his duties consisted of going to job sites, organizing and supervising planning, organizing equipment, and discussing work with Mr. Brock. He and his wife were the members of SS Construction, but Mr. Brock was never a member. SS Construction did all of its bookkeeping, bill paying, and receiving payments at the "Tylertown" address. Mr. Rutledge explained that he only visited the "West Olive" address for production, meetings, and reviewing jobs. SS Construction also stored its equipment at the "West Olive" address.

While he did spend time at the "Tylertown" address, Mr. Rutledge testified that a bulk of his time at SS Construction was either in the field or at the "West Olive" address. He explained that the "Tylertown" address was the address used on corporate documents for SS Construction. He admitted that payments from Quality Iron were sent to the "West Olive" address, which was approximately 70% of the dollar value of the work performed by SS Construction. However, he clarified that most of the time the payments were picked up at Quality Iron's office as opposed to being mailed. He stated he did not have any financial or ownership interest in SS Concrete. Furthermore, he was not a signatory on the bank account and was a mere W-2 employee for SS Concrete. Although both companies used the same bank, he testified that SS Construction and SS Concrete had separate bank accounts. He also testified that SS Construction did not sell, lease, or gift any of its equipment to SS Concrete. When SS Construction went out of business, it sold its equipment to a leasing company. Mr. Rutledge explained that Mr. Brock was the one who spoke to the leasing company on behalf of SS Construction.

Although SS Construction was essentially out of business in 2016, Mr. Rutledge concluded that the FedEx Project was completed and SS Construction fulfilled its subcontract with Quality Iron. SS Construction's position was that it had not paid SS Concrete because of "the wrongful failure and refusal of Quality Iron to pay" SS Construction for the work performed by SS Concrete. Therefore, Mr. Rutledge testified that if SS Construction would have been paid by Quality Iron, it would have paid SS Concrete for the work and labor provided on the FedEx Project.

Mr. Brian Eason testified as the president of Quality Iron.[4] He had known Mr. Brock and Mr. Rutledge for nearly his entire professional life. He was aware that Mr. Brock was the owner of Memphis Steel and that Mr. Rutledge was the owner of SS Construction. SS Construction was one of the primary contractors that Quality Iron used on projects. He stated that he mainly interacted with Mr. Rutledge when he was "pushing the jobs," which was construction parlance for attending job sites, coordinating workers and equipment, and helping the projects move forward. From time to time, he would see Mr. Rutledge pick up a check in Quality Iron's office, but a majority of his interaction with Mr. Rutledge was in

---

[4] At the time of trial, Mr. Eason stated that Quality Iron Fabricators, Inc. had transitioned to Quality Iron Fabricators, LLC.

the field. In contrast, he stated that Mr. Brock would be in the office bidding on work and completing paperwork to close out projects. Thus, he primarily interacted with Mr. Brock when dealing with SS Construction if it concerned office, administrative, and management matters. He testified that the nature of the interactions with Mr. Brock and Mr. Rutledge remained consistent throughout his time working with SS Construction. Based on his dealings with the two men, he believed that Mr. Brock made all of the significant management and contracting decisions for SS Construction.

Mr. Eason testified that Quality Iron had contracts with SS Construction on approximately eight projects, including the FedEx Project. According to Mr. Eason, Quality Iron was not made aware of SS Concrete's involvement with the FedEx Project until it received a letter from counsel for SS Concrete. Mr. Eason explained that SS Construction never obtained Quality Iron's consent to subcontract its remaining work to SS Concrete, which was a requirement of their contract. Thereafter, he received a copy of the lien filed by SS Concrete. He explained that filing a lien on a job site totally upsets the customer, which in turn upsets the general contractor. He admitted that the work was completed on the FedEx Project, but maintained that Quality Iron refused to pay SS Construction because of the provisions in their contract for withholding payment.

Mr. Eason testified that Mr. Brock approached him at one point about investing in SS Concrete, but Mr. Eason ultimately did not pursue the offer. During their conversations, he explained that Mr. Brock told him that SS Concrete would obtain its equipment from SS Construction. He was also told that Mr. Brock would continue to do the bidding and manage the company like he did for SS Construction. Mr. Eason testified that he never observed SS Construction and SS Concrete compete against each other. He described the names of the two companies as "interchangeable." He opined that SS Construction and SS Concrete were one and the same: "[i]t's the same entity, same management, same equipment, same people, same everything . . . ." He explained that the different entities he personally owned each paid their own bills; had their own equipment, manpower, supervision; and had different names and insurance. He could not say the same for SS Construction and SS Concrete. He stated that shutting the doors to one company and then opening up another with essentially the same outfit was not a common occurrence in his experience in the industry.

Mr. Craig Salabor testified as a former employee of Quality Iron who oversaw sales and served as the vice president and secretary-treasurer. He stated that he worked with Mr. Brock on several occasions while Mr. Brock was involved with both Memphis Steel and SS Construction. He explained that Mr. Brock was his contact person for both Memphis Steel and SS Construction, and that he did not correspond with anyone other than Mr. Brock. Specifically, he stated that Mr. Brock was his contact person for the FedEx Project. He first learned of SS Concrete when he received a call from CW Construction because of concern about the lien filed on the FedEx Project. He stated that he never had contact with SS Concrete, but later learned that Mr. Brock was the owner of SS Concrete.

The trial court entered its order on February 19, 2020. Because the trial court considered it to be a threshold issue, whether SS Concrete was the alter ego of SS Construction was first addressed. The trial court found that SS Concrete and SS Construction were one and the same, and were alter egos of each other. In reaching this conclusion, the trial court relied on *Road Sprinkler Fitters Local Union No. 669, U.A. AFL-CIO v. Dorn Sprinkler Co.*, 669 F.3d 790, 793-94 (6th Cir. 2012). The trial court compared SS Concrete and SS Construction by analyzing the factors provided in that case, which included the following: (1) business and marketplace; (2) management; (3) operation; (4) equipment; (5) customers; and (6) supervision.

Additionally, the trial court found that SS Concrete completed the work on the FedEx Project on time, on budget, and in a workmanlike manner. The trial court granted a money judgment to SS Concrete to be deposited in the clerk's office, granted SS Concrete's enforcement of its lien, and dismissed Quality Iron's cross-claim.[5] In dismissing Quality Iron's cross-claim, the trial court determined that because it found that SS Concrete was the alter ego of SS Construction, it could not find that SS Construction assigned part of the subcontract to SS Concrete for the reason that it found that the entities were one and the same. The trial court stated that "SS Construction could not enter into a contract with itself." Therefore, the trial court did not find a material breach for assigning part of the subcontract. Furthermore, even if there was a material breach, the trial court concluded that Quality Iron failed to prove any monetary damages relating to the FedEx Project. Thereafter, SS Concrete timely filed a notice of appeal.

## II.    ISSUE PRESENTED

SS Concrete presents the following issue for review on appeal, which we have slightly restated:

1. Whether the trial court erred in finding that SS Construction is the alter ego of SS Concrete.

For the following reasons, we affirm the trial court's decision.

## III.    STANDARD OF REVIEW[6]

---

[5] As part of the judgment, the trial court ruled that the funds could not be released "until the final resolution of all matters, projects, litigation, arbitration, etc." involving the parties.

[6] We note here that SS Concrete's appellate brief did not comply with Rule 27(a)(7)(B) of the Tennessee Rules of Appellate Procedure in that it failed to include a statement of the standard of review. Regardless, we proceed with our consideration of the sole issue raised on appeal, but "caution litigants that we may not be so forgiving in the future." *Garrard v. Tenn. Dep't of Correction*, No. M2013-01525-COA-R3-CV, 2014 WL 1887298, at *3 (Tenn. Ct. App. May 8, 2014).

We review a trial court's order following a non-jury trial "de novo upon the record, accompanied by a presumption of the correctness of the trial court's finding of fact, unless the preponderance of the evidence is otherwise." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012) (citing Tenn. R. App. P. 13(d); *Gautreaux v. Internal Med. Educ. Found.*, 336 S.W.3d 526, 532 (Tenn. 2011)). Because of this presumption, we will not disturb a trial court's finding of fact unless the aggregate weight of the evidence demonstrates that a finding of fact other than one found by the trial court is more probably true. *Estate of Haynes v. Braden*, 835 S.W.2d 19, 20 (Tenn. Ct. App. 1992). "[F]or the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *Nashville Ford Tractor, Inc. v. Great American Ins. Co.*, 194 S.W.3d 415, 425 (Tenn. Ct. App. 2005). Furthermore, "where the trial judge has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, on review considerable deference must still be accorded to those circumstances." *Jones v. Hartford Accident & Indem. Co.*, 811 S.W.2d 516, 521 (Tenn. 1991) (citations omitted). The Tennessee Supreme Court has explained that a trial court is in a far better position than the appellate court to resolve competing evidence. *Eldridge v. Eldridge*, 42 S.W.3d 82, 89 (Tenn. 2001) (citations omitted). "The trial court's conclusions of law are subject to de novo review with no presumption of correctness." *Rogers*, 367 S.W.3d at 204 (citing *Harman v. Univ. of Tenn.*, 353 S.W.3d 734, 736-37 (Tenn. 2011)).

## IV. DISCUSSION

The trial court described this case as "a construction case with absolutely no construction issues." However, in a different sense of the word, the sole issue on appeal requires construction of the relationship between two companies involved in this case. This Court must resolve whether the trial court erred in finding that SS Construction is the alter ego of SS Concrete. "The existence of an alter-ego relationship is a question of fact." *Wells ex rel. Baker v. State*, 435 S.W.3d 734, 756 (Tenn. Ct. App. 2013); *see Bracken v. Earl*, 40 S.W.3d 499, 502 (Tenn. Ct. App. 2000) (citing *Electric Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985)).

In reaching its conclusion, the trial court relied on the *Dorn* case from the Sixth Circuit. *Dorn*, 669 F.3d at 793-94. In *Dorn*, the Sixth Circuit explained its analysis of the alter-ego issue: "Where two companies are engaged in the same business in the same marketplace, courts ask 'whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision and ownership' to decide whether one is the alter ego of the other." *Dorn*, 669 F.3d at 794 (quoting *NLRB v. Fullerton Transfer & Storage Ltd.*, 910 F.2d 331, 336 (6th Cir. 1990)) (citation omitted). Under this test, "no one element should become a prerequisite to imposition of alter-ego status; rather, all the relevant factors must be considered together." *Id.* (quoting *NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576, 582 (6th Cir. 1986)). However, federal courts use this specific test when applying federal law. *See Trs. of Detroit*

- 10 -

*Carpenters Fringe Benefit Funds v. Indus. Contracting, LLC*, 581 F.3d 313, 317-18 (6th Cir. 2009) ("The alter ego doctrine is an equitable doctrine 'developed to prevent employers from evading obligations under the [National Labor Relations] Act merely by changing or altering their corporate form.'" (quoting *Allcoast Transfer*, 780 F.2d at 579)). Therefore, while the trial court relied on the *Dorn* case from the Sixth Circuit, we must apply Tennessee case law in our analysis. "It is the duty of this Court to apply the controlling law, for which there is a basis in the record, whether or not cited or relied upon by the parties." *Kocher v. Bearden*, 546 S.W.3d 78, 85 n.8 (Tenn. Ct. App. 2017) (quoting *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 658 n.1 (Tenn. 1990)).

Nevertheless, we note that we can still affirm the trial court even if it reached the correct result for the wrong reason under the "tipsy coachman doctrine."[7] *Biles v. Roby*, No. W2016-02139-COA-R3-CV, 2017 WL 3447910, at *6 n.3 (Tenn. Ct. App. Aug. 11, 2017) (citing *Torres v. Bridgestone/Firestone N. Am. Tire, LLC*, 498 S.W.2d 565, 577 (Tenn. Ct. App. 2016)); *see State v. Diaz de la Portilla*, 177 So.3d 965, 974 (Fla. 2015) (describing the "tipsy coach doctrine" which permits a reviewing court to affirm the decision of a lower court that reaches the right result for the wrong reason). Quality Iron asserts in its appellate brief that the same result would be reached under Tennessee law despite the trial court's reliance on *Dorn*. We ultimately agree.

In *Oceanics Schools, Inc. v. Barbour*, 112 S.W.3d 135, 145 (Tenn. Ct. App. 2003), this Court provided a "blueprint of factors" to be considered when addressing an alter ego issue. *Boles v. Nat'l Dev. Co. Inc.*, 175 S.W.3d 226, 245 (Tenn. Ct. App. 2005). We explained that blueprint as follows:

> As we learn from *Oceanics*, one starts with the premise that "[a] corporation is presumptively treated as a distinct entity, separate from its shareholders, officers, and directors." *Oceanics*, 112 S.W.3d at 140 (quoting *Schlater v. Haynie*, 833 S.W.2d [919,] 925 [(Tenn. Ct. App. 1991)]). However, a corporation's separate identity may be disregarded or pierced "upon a showing that it is a sham or a dummy or where necessary to accomplish justice." *Oceanics*, 112 S.W.3d at 140 (citing *Schlater*, 833 S.W.2d at 925).

---

[7] The "tipsy coachman doctrine" originates from *Lee v. Porter*, 63 Ga. 345, 346 (1879). In that case, the Georgia Supreme Court explained:

> It not infrequently happens that a judgment is affirmed upon a theory of the case which did not occur to the court that rendered it, or which did occur and was expressly repudiated. The human mind is so constituted that in many instances it *finds the truth* when wholly unable to *find the way* that leads to it.

*Id.* (emphasis in original). The Georgia Supreme Court then quoted from poet Oliver Goldsmith: "[T]he pupil of impulse, it forc'd him along, His conduct still right, with his argument wrong; Still aiming at honor, yet fearing to roam[,] The coachman was tipsy, the chariot drove home." *Id.*

A corporation's identity should be disregarded "with great caution and not precipitately." *Schlater*, 833 S.W.2d at 925. Whether to disregard the corporate fiction depends on the special circumstances of each case, *Oceanics*, 112 S.W.3d at 140, and "the matter is particularly within the province of the trial court." *Electric Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn.1985). No one factor is conclusive in determining whether or not to disregard a corporate entity; rather, courts should rely upon a combination of factors in deciding such an issue. *Schlater*, 833 S.W.2d at 925 (citing 18 Am. Jur. 2d Corporations § 48, p. 847, n. 41-42 (1985)).

*Id.* Moreover, we have explained that "[b]y suitable evidence, it may be established that separate corporations should be treated as a single entity." *Smith v. Hi-Speed, Inc.*, 536 S.W.3d 458, 482 n.12 (Tenn. Ct. App. 2016) (quoting *Muroll Gesellschaft M.B.H. v. Tenn. Tape, Inc.*, 908 S.W.2d 211, 213 (Tenn. Ct. App. 1995)).

Tennessee courts have consistently relied upon the factors promogulated in *FDIC v. Allen*, 584 F. Supp. 386, 397 (E.D. Tenn. 1984) to determine whether a corporation's separate legal identity should be ignored.[8] *CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73, 88-89 (Tenn. 2010) (footnote omitted); *see, e.g., Pamperin v. Streamline Mfg., Inc.*, 276 S.W.3d 428, 438 (Tenn. Ct. App. 2008); *Altice v. NATS, Inc.*, No. M2007-00212-COA-R3-CV, 2008 WL 1744571, at *2-3 (Tenn. Ct. App. Apr. 15, 2008). "Tennessee cases nearly uniformly consider the Allen factors in determining this issue." *F&M Mktg. Servs., Inc. v. Christenberry Trucking & Farm, Inc.*, No. E2015-00266-COA-R3-CV, 2015 WL 6122872, at *5 (Tenn. Ct. App. Oct. 19, 2015) (citations omitted). The district court in *Allen* explained that:

Factors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; *(5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation;* (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the

---

[8] We recognize the irony of stating that the *Dorn* factors provided by one federal court are not applicable, and then stating that Tennessee relies on the *Allen* factors provided by another federal court. However, we emphasize the difference between these two cases: both the Tennessee Supreme Court and the Tennessee Court of Appeals have consistently applied the *Allen* factors in numerous cases under these circumstances, whereas neither the Tennessee Supreme Court nor the Tennessee Court of Appeals have applied the *Dorn* factors in any case.

manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms[-]length relationships among related entities.

*Allen*, 584 F. Supp. at 397 (citations omitted and emphasis added). In its analysis under *Dorn*, the trial court found that "both companies used . . . virtually the same equipment and employees. Neither was competitor of the other; in fact, the companies overlapped and worked together. Further, for both SS Construction and SS Concrete, [Mr.] Brock performed the office work, and [Mr.] Rutledge performed the site work." Here, we decide this issue under the relevant *Allen* factors. Similar to *Dorn*, however, "no single factor among those listed is conclusive, nor is it required that all of these factors support piercing the corporate veil; typically, courts will rely on a combination of the factors in deciding the issue." *Rogers*, 367 S.W.3d at 215 (citing *Oceanics*, 112 S.W.3d at 140).

For more than a decade, SS Construction performed steel erection work as a subcontractor for companies such as Quality Iron. Beginning in 2015, however, SS Construction began to subcontract its steel erection work to SS Concrete. SS Concrete worked on several different projects as a subcontractor for SS Construction: Pink Palace; Sheehan Pumping Station; I-55 Welcome Center; 60 Madison Avenue; Iberia Bank; Crawford County Jail; Berclair School; Westhaven School; and Well Station School. The two companies worked together on all of these projects because they had "an agreement." SS Construction and SS Concrete never bid on work against each other, and therefore they never competed against each other. Despite being listed as two separate entities, the ERM-14 form stated that SS Concrete performed "the same work with the same people and equipment" as SS Construction.

While he was an employee at Quality Iron, Mr. Salabor only corresponded with Mr. Brock when dealing with SS Construction. Mr. Eason primarily interacted with Mr. Brock when dealing with SS Construction if it concerned office, administrative, and management matters. Conversely, he primarily interacted with Mr. Rutledge in the field. Based on his dealings with the two men, he believed that Mr. Brock made all of the significant management and contracting decisions for SS Construction. On the ERM-14 form, SS Construction and SS Concrete listed Mr. Brock as the contact person and provided the same physical address, email address, and phone number. Moreover, the form stated that SS Concrete's owner, Mr. Brock, was a "key employee" of SS Construction. Mr. Brock did everything from invoicing and estimating jobs to managing projects and employees. In addition to these duties, he also signed contracts on behalf of SS Construction. Mr. Brock was SS Construction's vice president at one time and executed subcontracts as SS Construction's "CEO." He handled a number of management aspects and helped Mr. Rutledge run the business. In regard to SS Concrete, Mr. Brock handled all aspects of the company. Although SS Concrete began its operation in June 2015, Mr. Brock continued

- 13 -

to perform management duties on behalf of SS Construction as late as May 2016. Mr. Brock simultaneously held a managerial role for both SS Construction and SS Concrete.

While SS Construction and SS Concrete had two separate addresses for their business offices, Mr. Brock used the "West Olive" address as the address for SS Construction when he signed some of the subcontracts for projects with Quality Iron, included the "West Olive" address in correspondence with Quality Iron, and admitted that he did so on behalf of SS Construction. While Mr. Rutledge did spend time at the "Tylertown" address, a bulk of his time at SS Construction was spent either in the field or at the "West Olive" address. As stated before, SS Construction and SS Concrete provided the same physical address, email address, and phone number on the ERM-14 form. SS Concrete's business was located at the "West Olive" address, and SS Construction's use of that address demonstrated that there was a continuity of work space between the two companies. Both SS Construction and SS Concrete were signatory contractors with the Union in the Memphis area and agreed to hire iron workers from the Union for their projects. Both companies were required to hire from the Union's pool of personnel, which made it inevitable that the companies would be using some of the same employees. However, 17 employees that had worked for SS Construction on a previous project came on the FedEx Project for SS Concrete, which demonstrated a continuity of work force between the two companies. In addition to work force and work space, SS Construction and SS Concrete used the same insurance company, had identical insurance policies with identical coverage, and used the same bank.

SS Construction never sold, gifted, or transferred any of its equipment to SS Concrete. Rather, SS Concrete leased its equipment from a leasing company and some of the equipment had been used by SS Construction in the past. Yet, Mr. Brock was the one who spoke to the leasing company on behalf of SS Construction. Mr. Brock personally owned some of the equipment, which explained why the two companies had used some of the same equipment. In SS Concrete's insurance policy, virtually all of the insured equipment had been previously insured on SS Construction's insurance policies. According to Mr. Eason, Mr. Brock told him that SS Concrete would obtain its equipment from SS Construction.

As we have already discussed, SS Construction and SS Concrete were both signatory contractors with the Union in the Memphis area. After SS Concrete's formation in June 2015, SS Construction began to subcontract some of its steel erection work to SS Concrete. SS Construction and SS Concrete worked together on several projects. Specifically, in January 2016, SS Construction subcontracted its remaining work on the FedEx Project to SS Concrete. Once SS Concrete was formed, the evidence demonstrates that SS Construction subcontracted a significant amount of its steel erection work to SS Concrete despite the fact that SS Construction's business purpose was to perform that type of work. After subcontracting its remaining work on the FedEx Project to SS Concrete, SS Construction ceased doing business in February 2016 and was administratively dissolved

in 2017. SS Construction ceased doing business partly because it could no longer pay its Union dues.

Mr. Brock, as president of SS Concrete, made the decision to work for SS Construction as a subcontractor to complete the work on the FedEx Project. However, as explained before, Mr. Brock continued to perform management duties on behalf of SS Construction as late as May 2016. He was aware of the work SS Construction had already completed on the FedEx Project because he estimated and managed the project on behalf of SS Construction. Thus, Mr. Brock supervised the FedEx Project for both companies in his capacity as a project manager. For the FedEx Project specifically, both SS Construction and SS Concrete prepared daily job reports. More than half of SS Concrete's daily job reports were prepared by the same foremen that prepared SS Construction's daily job reports. The remainder of SS Concrete's daily job reports were prepared by men who also worked for SS Construction.

Applying the relevant *Allen* factors, we find that SS Concrete was SS Construction's "other self." *Oceanics*, 112 S.W.3d at 145 (citing *Matthews Constr. Co., Inc. v. Rosen*, 796 S.W.2d 692, 694 (Tex. 1990)). The evidence established that SS Concrete's "West Olive" address was frequently used by SS Construction as a work space and contact address. *See Allen*, 584 F. Supp. at 397 (describing "the use of the same office or business location" as one of the factors to be considered). SS Concrete and SS Construction also used the same insurance company and bank. Moreover, SS Concrete did not compete with SS Construction; rather, it assumed much of SS Construction's steel erection work. When SS Construction ultimately stopped doing business in 2016, SS Concrete assumed the remaining work on the FedEx Project and used the equipment, employees, and supervision previously used by SS Construction. *See Allen*, 584 F. Supp. at 397 (describing "the employment of the same employees or attorneys" as one of the factors to be considered).

Finally, "the use of the corporation as an instrumentality or business conduit for an individual or another corporation" is one of the factors to be considered. *Allen*, 584 F. Supp. at 397. We have stated that "[t]he control necessary to invoke what is sometimes called the 'instrumentality rule' is not mere majority or complete stock control but such domination of finances, policies and practices that the controlled corporation has . . . no separate mind, will or existence of its own . . . ." *Marshall v. Jackson*, No. M2007-01764-COA-R3-CV, 2008 WL 5156312, at *8 (Tenn. Ct. App. Dec. 8, 2008) (quoting *Neese v. Fireman's Fund Ins. Co.*, 386 S.W.2d 918, 921 (Tenn. Ct. App. 1964)). When Memphis Steel went out of business in 2004, Mr. Brock discussed with Mr. Rutledge the possibility of forming a new company "to keep people working and keep making money." Similarly, when Mr. Brock formed SS Concrete in 2015, Mr. Rutledge did not know how he was "going to make it through" without Mr. Brock working for SS Construction. Therefore, they formed "an agreement" that SS Concrete would "subcontract back" to SS Construction. Mr. Brock was a "key employee" for SS Construction, made the significant management and contracting decisions for SS Construction, and simultaneously served in

his managerial role for both companies for a period of time. At SS Concrete, he served in a significant managerial role handling all aspects of the company. Furthermore, he signed the subcontract for the FedEx Project on behalf of SS Construction, and then later made the decision on behalf of SS Concrete to work for SS Construction as a subcontractor to complete the remaining work. As such, "in furtherance of the ends of justice," we find that this is "an appropriate case" where the two companies should be treated as identical. *Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991) (citing *E.O. Bailey & Co. v. Union Planters Title Guar. Co.*, 232 S.W.2d 309, 319 (Tenn. Ct. App. 1949)).

We conclude that the evidence preponderates in favor of the conclusion that these two companies are one and the same, and therefore were alter egos of each other for the purposes of this project. Accordingly, we hold that the trial court did not err in finding that SS Construction was the alter ego of SS Concrete. We stress that our holding affirming the trial court's determination that SS Construction was the alter ego of SS Concrete is limited to this case involving the FedEx Project. The evidence shows that SS Construction and SS Concrete have worked together on several other projects. The circumstances of each of those projects must be considered on a case-by-case basis, and the findings made herein do not necessarily apply to any other endeavors between the two entities.

## V.    CONCLUSION

For the aforementioned reasons, we affirm the decision of the trial court. Costs of this appeal are taxed to the appellant, Southern Steel & Concrete, Inc., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE